**FILED**

JAN **1 0** 2020

TIMOTHY M. O'BRIEN CLERK
By _____*CA*_____ Deputy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

Christian Blake
6615 W 53rd st
Mission KS 66202
lovi415@ gmail.com
415-797-8740

JEFFREY S GREEN

**PLAINTIFF,**

**V.**

Case No. 18-2247-CM-JPO

CHRISTIAN BLAKE FISHER &
JOSHUA LEONARD

**DEFENDANTS,**

Joshua Leonard
2505 W 97th TER
LEAWOOD, KS 66216
Josh.leonard@gmail.com
913.220.9929

### ANSWER AND AFFIRMATIVE DEFENSES

Comes now Christian Blake Fisher and Joshua Leonard, Defendants herein, submit their amended answer and affirmative defenses to the allegations contained in the Complaint filed against them herein.

### FIRST DEFENSE

Defendants would show that the Complaint fails to state a claim or cause of action against them upon which any relief can be granted.

The defendants had no control over the fate of the Plaintiff's investment as neither Defendant was managing the Company at the time in which the Company ceased its operations at the direction of the Plaintiff. Thus, the Defendants could not have caused the Plaintiff's investment to be rendered worthless. Further, the Defendants assert [Exhibit A (1) Security Assets of the Company] assets of the Company, when liquidated, would have rendered his investment being returned in whole. The Defendants have learned that the Plaintiff ceased Company operations; however, Jeffrey "Hawk" Marsden (the Company's employee and Master Grower) has continued to operate an ongoing cannabis business, on the Company's property with the Company's assets. [Exhibit A(2) Links to videos of Mr. Marsden over the last year]

## SECOND DEFENSE

Jeffrey "Hawk" Marsden was in fact an employee of the Company as the Master Grower. The Company marketed and sold its products under the brand name of "Hawk Pharms" [Exhibit B (1), Mr. Marsden's employment verification, Check Stubs, W4, communication between Mr. Marsden and multiple members performing his duties)

Marsden contributed his considerable cannabis industry knowledge and experience. This included (but was not limited to) seed, plant genetics, plant care processes and guides, plant nutrition, pest management, product processing (e.g. drying, curing, converting to finished products), industry connections (genetics suppliers, clone producers, customers, material suppliers, etc.). Marsden accepted compensation from the Company in the form of cash payments, payroll, and received Company assets which he utilized for his benefit (e.g. recreational vehicle used as his residence, Company real estate and produced products).

The Defendants concede that if it was represented to any investor that Marsden was in fact an employee and "Master Grower" of the company, and he indeed was not, that would warrant a clear deception that would impact the Company's ability to operate with unique intellectual property and proprietary assets that Marsden would bring.

Marsden was not only employed by the Company, he lived on and is currently residing at the Company's property in lodging (RV) the Company purchased and kept on the property for his primary use and benefit. In addition, Marsden has been known throughout his career of over 20 years as "Hawk", the Company's DBA at the time of the Plaintiff's investment was "Hawk Pharms".

Further, the development of Marsden's updated and amended contract was being overseen and managed by the Plaintiff, as well as, the Plaintiff's current counsel (Laner) [Exhibit B (2), communication between the Plaintiff and Defendant Blake outlining the Plaintiffs management of Mr. Marsdens updated contract] outlines communication to that effect) at the time of the Defendants termination by the Plaintiff.

Marsden was engaged with the Company and the Plaintiff to join the Company as a vested investor based on his role and contribution of genetics (cannabis seeds). This was the primary business purpose for the development of Marsden's updated contract. Marsden was

already an employee of the Company as the Master Grower and had conveyed thousands of seeds in good faith to the Company toward this agreement, and the Company had provided monetary compensation to Marsden, at the time of the Defendants terminations. At that time, the Plaintiff was the Company manager responsible for completing Marsden's contract.

## THIRD DEFENSE

The Plaintiff engaged with the Company, not only as a passive, arms-length investor, but as an active manager, Board member, and Board manager [Exhibit C (1) Documentation of communication from the Plaintiff where in he is managing legal, financial, project management, marketing, hiring and termination responsibilities for the company].The Plaintiff claims that the alleged misrepresentations to induce investment, prior to his investment into the Company, caused him to experience financial loss as the Company was mismanaged.

The Plaintiff alleges that Blake and Leonard misrepresented their personal finances, educational background, professional background, successes in "selling companies," the employment of Marsden as the Company's master grower, as well as Marsden's services and assets being secured.

The Plaintiff has not shown sufficient proof that A) Misrepresentations were indeed made and with the intent to induce an investment from him B) That he relied on the alleged misrepresentations to make his investment C) The alleged misrepresentations were the cause of his investment to be rendered worthless.

The facts pattern of one fact does not contribute to the other(s). The Plaintiff had full and complete knowledge of the Company's operations, finances and contractual standings. The Plaintiff chose to cease Company operations without following the Company's bylaws outlining the evaluation of assets for liquidation purposes. Therefore, the Defendants could not have caused the Plaintiff to sustain financial harm by way of the alleged misrepresentations to induce investment.

Prior to the Plaintiff's complaint, Plaintiff and Defendants entered into an agreement by which Plaintiff, being fully informed of the risks of engaging in a cannabis based business, invested in on that basis. The Plaintiff expressly outlined that the basis of his investment would

rest on his ability to review the Company's prepared projected financials, his meeting(s) with Marsden, the Company's namesake and Master Grower, his assessment and review of the Company's operations, and meetings with Company employees to gain a sense of their role and responsibility within the business.

The Plaintiff, in his own words through his initial filing to this court, specified [Count 1, 15(b)] *"Despite having assured Green (and other investors) that they had secured the assets and services of Mr. Marsden, critical to the viability of the Company, they failed to secure either the assets or the services – **a failure which in effect nullified the business plan which induced Green's investment"**.* The Plaintiff was satisfied with the above mentioned items. The Plaintiff met with Marsden during two visits where Marsden's role was discussed by both the Plaintiff and Marsden.

At no point were either Defendants asked to furnish any form of accounting of personal finances, nor were they asked (along with the entire executive team, which the Plaintiff ultimately became an active member after his initial investment) to submit to any form of background checks as part of the Plaintiff's due diligence.

The Defendants were clear about the risks associated with investing in an early stage company and the fact that the cannabis industry was only legal within specific state laws and not yet legal Federally, which resulted in excess market volatility.

The Plaintiff expressly agreed by executing his term sheet to the risks associated with participating in an industry, that at the time could be negatively impacted by new act(s) of Congress and the Federal Justice Department. It was discussed that it could cause for the executive team to face legal ramifications, given that the Company was a cultivator of a Federal Schedule A narcotic.

The Plaintiff has mislead the Court to believing he was in fact an arms length, passive investor. The Plaintiff was the Manager of the Company Board of Directors and Manager of the Company's Legal operations (including licensing, employment contracts, Company operating legal documents and investor relations), Company project management activities, as well as assisting with the management of the Company's finances and accounting. The Plaintiff controlled the fate of the Company to the same degree that the Defendants did up to the point of

their unlawful termination from the Company. In addition, the Plaintiff principally controlled the fate of the Company after the Defendants termination.

The Plaintiff and Defendant Blake spoke multiple times a day, six days a week, at times totaling over two hours per phone call for nearly nine consecutive months. They discussed all aspects of the Company's business operations, sales and strategy. This is verified by phone records. The Plaintiff was fully aware of the Defendants' activities and all Company operations as he himself held as much (and more given his dismissal of the Defendants from the Company) control over the operations.

The Plaintiff was knowledgeable of the ongoing co-mingling of the Company's financial accounts due to difficult Federal banking regulations of the cannabis industry. The Plaintiff and Company's counsel (Green's current counsel, Laner) was managing the associated legal action of executing an "agency" agreement between the co-mingled entities (Hawk Pharms/63rd St Enterprises and Hidden Street Ventures), which (at the direction of the Company's counsel to both Defendants as well as the Plaintiff) would alleviate the legal concerns associated with the co-mingling and help the Company to legitimize its banking operations moving forward.

The Plaintiff took responsibility to oversee and run the Company after the unlawful termination of the Defendants from the Company. The Plaintiff mislead Company members with his intentions for the Company through his termination of both Defendants (without the correct authority, per the Company's by-laws).

The Plaintiff made no documented efforts to market, value and sell the Company's real estate, secure the remaining outstanding, genetic seeds and plants of Marsden, negotiate with creditors, nor maintain and stabilize Company operations. Within hours after the Defendant's termination, the Plaintiff informed the Company's employees that the business was closing and everyone would no longer be employed. This was a decision that the Plaintiff made without properly evaluating the Company's assets and viable options for continuing Company operations. The Plaintiff made no further efforts to mitigate risks of loss to himself or the other Company members as outlined above.

The Defendants have documentation showing the Company was actively engaged in ongoing sales totaling over $200,000 in revenue at the time of termination and the Company ceased its operations at the Plaintiff's direction. Following termination, the Defendants continued to receive calls, emails, texts and voicemails from customers seeking to purchase Company product. Sales related outreach was brought to the attention of the Plaintiff and the Company's counsel (Laner), and the Defendants received no response.

This came after the Defendants requested a meeting with the Plaintiff and the Company's counsel (Laner), to discuss the nature of their termination and because the Defendants still held proprietary information on the sales and marketing of the Company's operations necessary for the Company to not experience any lag in operations. Green, as well as, the Company's counsel (Laner) did not respond.

Following termination and after illegally breaking into the Defendants' Oregon residence, the Plaintiff texted the Defendants requesting they return "the seeds". The cannabis seeds are the very item the Plaintiff is using as the basis of his claim for the alleged misrepresentation to induce investment. The Company assets for which the Plaintiff is continuing to use a basis for his claim is not true. [Exhibit C (2), Communication in which the Plaintiff demanded the assets and seeds from the Defendants. It should be noted that the Defendants had just landed back in Kansas City and were not in Oregon at this time].

## FOURTH DEFENSE

The Defendants assert the Plaintiff to be engaging in a pattern of Abuse of Process given his inconsistent, unreliable and outright deceptive filings. On more than one occasion the Plaintiff has produced filings to the Court with the intent of deceiving the Court, as evident with the Plaintiff's filing for sanctions against both Defendants for not following this Court's procedures.

Both Defendants are Pro Se and have no formal legal background or training, where as the Plaintiff's counsel (Laner) is a member of the bar and has formal legal schooling. This should be considered when Laner disregard Federal rules of procedure regarding the allowance of time to withdraw a motion by the other party and instead move to sanction two pro se Defendants.

The Plaintiff, by way of "Forum Shopping", continues to undermine the Court's time and rulings. The filing is attached as [Exhibit D (1), The identical case refiled by the Plaintiff in the Johnson County Civil Court].

At the time of the Defendants' termination from the Company, the Plaintiff, and other Company employees at his direction, illegally enter the Defendants' Oregon residence (searching for Company assets, principally cannabis seeds), wherein they stole Defendants' items of personal nature, up-ended the residence and caused property damage. The Defendants were informed of the activity with photos as well as the Plaintiff's own admission in writing to his illegal activities. The Plaintiff maintains the Oregon residence was Company property as monthly rent was paid for in Company funds. However, this is an unsupported assertion. The Defendants were the lease holders and lease signers, not the Company. The rent was paid for by the Defendants, not the Company. At the time of the illegal entry, there was no method for the Plaintiff to factually determine that the lease was paid with Company funds, as the Plaintiff asserts. At the time of the illegal entry, both Defendants were in Kansas and the property owner and landlord was asked not to contact local law enforcement due to the Defendants uncertainty of what had happened. Upon the Defendants return to Oregon two weeks later, they were presented with photos and audio/video of the incident by way of two battery operated cameras placed within the residence.

The Plaintiff contacted two parties in particular that the Defendants are aware of, stating, "If you do not call me back I will force you to testify by way of issuing a subpoena to you anyway." The Plaintiff directed his business associates to contact Defendant Blake's then employer, stating that he should terminate Defendant Blake.

Defendant Blake's then employer was asked if he would produce documentation of communication (between he and Blake) to assist in the Plaintiff's case against Defendant Blake. This caused harm to Defendant Blake's professional standing with his employer but not before his employer expressed in writing that he felt harassed, intimidated, and uncomfortable with the four phone calls and four emails he received, going as far as to state to one of the Plaintiff's representatives that he "needs to stop calling and emailing him". The employer shared the written communication with Defendant Blake, where in the Plaintiff's representatives engaged in

outright defamation, including furnishing the documents in this case, records from Defendant Blake's childhood and items from his previous investors in this case.

In addition, Defendant Blake has seen (and possesses written evidence and statements from Blake's former employer) that the Plaintiff has had current employees of a company in which he has invested in contact the Defendants' employers to disparage both (again doing so both himself and through his business associates).

The Plaintiff contacted Defendant Blake's wife via phone and text proceeding to disparage Blake, lay claim to his character and "illegal activities". The Plaintiff instructed Blake's wife to leave him (all of which led Blake's wife to instruct the Plaintiff to not contact her or any member of their family).

If the true intent of the Plaintiff's claim is to recover monetary relief for what the Plaintiff believes he is owed from the claims waged against the Defendants, his actions tell a different story.

As pro se, Blake and Leonard are at a disadvantage with the frequent filings from the Plaintiff and his counsel, requiring responses from the Defendants as evident with the Plaintiff and his counsel's recent late filing to withdraw amended claims after Judge O'Hara's recommendations.

The Defendants have represented themselves over the last two years to much financial burden and personal strain. In contrast, the Plaintiff has continually stated that his legal fees are currently being paid for by others (27 former members of the former Company).

The Defendants have come to the conclusion that the true intent of the Plaintiff is to disparage both defendants (this became evident when the Plaintiff submitted his list of people and entities to depose as it includes the Defendant Blake's parents). The Defendants thus made the decision to offer a sum that might appease the Plaintiff so the Defendants could move on with their lives in a way that would stop the attacks on their character.

The Plaintiff's initial response was that he would only settle with one Defendant (Leonard), and only after his counsel had informed him on the initial scheduling call with all parties that this was Court ordered for all the parties to discuss. The Plaintiff asked for amounts totaling over $1,200,000 from the Defendants, an amount that is excessive in nature and sum.

The Plaintiff has engaged in consistent defiance of the Court's rulings. However, both Defendants had offered a settlement offer equal to $100,000 spread over time and in monthly payments.

The Plaintiff's counsel, and it is assumed by extension the Plaintiff, was instructed by the Court (Judge O'Hara) to allow for 10 witnesses to be deposed [Exhibit D (2), the transcript from Judge O'Hara]. However, after Judge O'Hara's ruling the Plaintiff issued his production of documents request with the current list of witnesses to depose. The Plaintiff's list includes more than 30 parties, which is a direct descent from that of what this Court ruled was appropriate and allowable.

The Plaintiff has repeatedly shown his lack of respect for the Court's time and resources and has repeatedly ignored the Court's ruling on the claims and scope by asking for overburdensome and irrelevant production of discovery.

The Plaintiff is not clear on the scope of his claim allowed by this Court. The Plaintiff is asking for items (e.g. bank records of the Defendants' spouses among other items that do not pertain to his current claim of misrepresentation). The Defendants consider the Plaintiff's tactics as overly burdensome and beyond the Court's ordered scope in this case.

Since the Court's opinion on his request for derivative claims, the Plaintiff has refiled identical claims under the identical format, representing himself as the representative on behalf of the entity (which the Court saw as improper) with the Johnson County Civil Court (Division 11). The Plaintiff is "Forum Shopping" and doing so against the position of the Court.

Exhibits:

[Exhibit A (1) Security Assets of the Company]
[Exhibit A(2) Links to videos of Mr. Marsden over the last year]
[Exhibit B (1), Mr. Marsden's employment verification, Check Stubs, W4, communication between Mr. Marsden and multiple members performing his duties]
[Exhibit B (2), communication between the Plaintiff and Defendant Blake outlining the Plaintiffs management of Mr. Marsdens updated contract]
[Exhibit C (1) Documentation of communication from the Plaintiff where in he is managing legal, financial, project management, marketing, hiring and termination responsibilities for the company].
[Exhibit C (2), Communication in which the Plaintiff demanded the assets and seeds from the Defendants. It should be noted that the Defendants had just landed back in Kansas City and were not in Oregon at this time].

[Exhibit D (1), The identical case refiled by the Plaintiff in the Johnson County Civil Court].

[Exhibit D (2), the transcript from Judge O'Hara].


       Wherefore, both Defendants have represented their amended responses and affirmative defenses to the claim brought before them and this court.

Respectfully submitted,

JOSHUA LEONARD

_____  1/10/2020
**DEFENDANT**


_____  1/10/2020
**DEFENDANT**

## CERTIFICATE OF SERVICE

      We, *Christian Blake Fisher and Joshua Leonard, (Defendants)* do hereby certify that a true and correct copy of the above and foregoing Answer and Affirmative Defenses has been sent, via email to Joel B. Laner, Counsel for the Plaintiff on _1/10/20_ .

      So certified, this the _10th_ day of _JAN_ , 202_0_ .

JOSHUA LEONARD

_____  1/10/2020
**DEFENDANT**

_____  1/10/2020
**DEFENDANT**